IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 29, 2012

## STATE OF TENNESSEE v. MARK ZANE GIBSON

**Appeal from the Criminal Court for Monroe County**
**No. 07-149     Amy Reedy, Judge**

---

**No.  E2011-00938-CCA-R3-CD - Filed February 19, 2013**

---

Appellant, Mark Zane Gibson, was indicted by the Monroe County Grand Jury for one count each of aggravated sexual battery, rape, and incest.  At the conclusion of trial, the jury convicted Appellant of attempted aggravated sexual battery and rape.  The trial court sentenced Appellant to an effective sentence of fifteen years.  On appeal, Appellant argues that the evidence was insufficient to support his convictions and that the trial court erred in setting the length of his sentences by not applying any mitigating factors and in denying his request for alternative sentencing.  We conclude that the evidence was sufficient to support the convictions.  With regard to his sentence, Appellant committed the crime between July 1, 1982, and June 7, 2005.  Therefore, the prior sentencing law should apply to his sentence unless Appellant executed an ex post facto waiver.  There is no such waiver in the record, and it appears that the trial court applied the new sentencing act when sentencing Appellant. Therefore, Appellant's sentence must be reversed and a new sentencing hearing must be held. For these reasons, we affirm Appellant's convictions and reverse his sentence and remand for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Jeanne L. Wiggins, Assistant Public Defender, Madisonville, Tennessee, for the appellant, Mark Zane Gibson.
Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Steven Bebb, District Attorney General; and Andrew Freiberg, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

Appellant and the victim's mother dated for about a year and a half before marrying in January 1995. The victim was almost six years old at the time of the marriage. When the victim was in the fifth grade, between the ages of nine and eleven, Appellant began to touch the victim on her private parts and engage in cunnilingus. The victim testified that Appellant would lick around "the outside and then on the inside of [her] vagina."

The summer after the victim was in sixth grade, she and her mother planned a trip to a relative's cabin. Appellant went with the victim to see the cabin before the trip. While at the cabin, they went up to a loft and both took off their clothes from the waist down. Appellant rubbed his erect penis on the outside of the victim's vagina, but he did not penetrate her.

The summer before the victim's freshman year in high school Appellant had sexual intercourse with the victim in his bedroom. From that time until Appellant left the home in 2006, Appellant and the victim engaged in sexual intercourse at least once or twice a week. During these occasions, Appellant penetrated the victim's vagina, but he would not ejaculate inside her. Appellant also requested oral sex from the victim.

The victim stated that Appellant would not physically force her to have intercourse with him. Instead, he would get mad and curse at the victim, flip her off and shove her as he walked by her. The victim decided it would be easier to give in and have intercourse with Appellant so that he would leave her alone.

At some point, Appellant gave the victim a ring and told her to wear it on the ring finger of her left hand. He told her that they were married in the eyes of God. Sometimes Appellant would get angry at the victim and take the ring, other times the victim would dispose of the ring. Appellant would buy a new ring for the victim on these occasions.

In June 2006, the victim was seventeen years old. She attended a Bible Camp and told a counselor that Appellant would shove her when he was angry with her. As a result, Jennifer Bledsoe, with the Department of Children's Services, met with the victim and her mother at their house. The victim did not disclose the sexual abuse at this time. She was too afraid of Appellant and the threats he had made against her family. The victim's mother made Appellant leave the home after the meeting with Ms. Bledsoe. This occurred in July 2006. Appellant and the victim's mother were divorced in November 2006.

-2-

In early 2007, the victim was having a discussion with her maternal grandparents about her mother's marital status. Because of their religion, the victim's grandparents believed that the victim's mother could not get remarried unless Appellant had committed adultery. This conversation prompted the victim to tell her grandparents that Appellant had been sexually abusing her. The victim told her grandparents that she wanted to be the one to tell her mother.

On March 11, 2007, a few weeks after her conversation with her grandparents, the victim gave her mother a letter describing the sexual abuse she endured at the hands of Appellant. The victim and her mother went to the police to report the abuse. Ms. Bledsoe had joined the police department and was now Detective Bledsoe. She spoke with the victim and took a statement from her at the Child Advocacy Center.

After Appellant left the home in July 2006, the victim's mother noticed that telephone conversations between the victim and Appellant would become very heated. Therefore, the victim's mother began to secretly record their telephone conversations. The victim's mother found one conversation in particular to be questionable. The telephone conversation was presented as evidence at the trial during the victim's testimony. The conversation was long and rambling. Appellant and the victim became very angry with each other on different occasions. The following exchange occurred in the telephone conversation:

[Appellant]: What about stuff that we did [victim]?

[The victim]: What about it?

[Appellant]: You know what I'm talking about don't you?

[The victim]: What about it?

[Appellant]: That didn't mean nothing.

[The victim]: Yeah.

[Appellant]: It did me too and it hurt me, not just that, but everything. It just hurt me. (Inaudible)

[The victim]: I gave you a chance, I have [given] you fifty million chances.

[Appellant]: Fuck you and that chance. That's what I've got to say about it.

Do you know I love you?

[The victim]: Yeah.

[Appellant]: Now when you screw a boy are you going to think of us?

[The victim]: Uh (Pause) am I ruined?

[Appellant]: (Inaudible)

[The victim]: True.

[Appellant]: I said we've made it through some stuff before.

[The victim]: Yeah.

[Appellant]: We've always made it through.


The victim testified about the telephone conversation. She said that the chances she talked about were chances she gave Appellant to not be verbally abusive to her. When Appellant mentioned "the stuff they did" the victim testified that this was a reference to the sexual abuse. The conversation also included Appellant's asking her if she had a boyfriend, berating her about the clothes she wore, and attacking her about something she allegedly did behind his back.

The victim's mother also testified at trial. She stated that she began dating Appellant in September 1993 and they were married on January 28, 1995. The victim was six years old at the time they were married. The victim's mother began working as a certified nursing assistant in 1993 and eventually became a registered nurse by going to school. While she was at work and school, Appellant would care for the victim. Shortly after the first year of the marriage, Appellant quit his job and worked off and on throughout the rest of the marriage. She stated that he often did not work , and as time wore on, they became less and less intimate.

The victim's mother agreed with the victim's testimony that they went to stay in a cabin owned by her cousin, Donny Kelly, in 2000 or 2001. The victim had just finished sixth grade and would have been ten or eleven years old.

The victim's mother recalled that Ms. Bledsoe came to her house in July 2006 and said that Appellant had hit the victim. When she asked the victim about it, the victim told her mother that Appellant had shaken her. The victim's mother forced Appellant to move out of her house on July 18, 2006. They divorced on November 28, 2006, and she last had contact with Appellant in December 2006.

After the separation in July 2006, Appellant continued to call the victim. The victim's mother said that when they spoke on the telephone, they argued loudly, and the victim would tell her mother that Appellant was mean to her. The victim's mother began recording the telephone calls without the victim's knowledge.

On March 11, 2007, the victim's mother received a letter from the victim that set out the years of sexual abuse suffered by the victim. The victim handed her mother the letter personally and stayed with her while she read it. That same evening, the victim and her mother went to the police. Detective Bledsoe spoke with both the victim and her mother. She tried to speak with Appellant, but she was unable to locate him.

In May 2007, the Monroe County Grand Jury indicted Appellant for one count of aggravated sexual battery and one count of rape. Appellant failed to appear at a status hearing on July 21, 2008, and on the scheduled trial date of July 23, 2008. The trial court entered a capias for Appellant's arrest, and Appellant was charged with failure to appear.

Officers attempted to find Appellant. At some point, officers discovered that Appellant was staying with Julie Evans. Before the police could apprehend him, Appellant fled. Police later located Appellant at the residence of Kathy Saffles. However, Appellant fled once again before they could apprehend him. Ms. Saffles was arrested for harboring Appellant. A manhunt was conducted in the area surrounding Ms. Saffles's residence by U.S. Marshals and other agencies. The next day, U.S. Marshals discovered Appellant and Ms. Evans in a motel. He was successfully apprehended. The capture occurred about eighteen months after his trial date.

Appellant was brought to trial on the charges in question in this appeal. He testified on his own behalf. He denied touching the victim inappropriately or having sexual intercourse with her. He recalled staying at the cabin but said he was never alone with the victim. He agreed that the victim's mother told him to move out in July 2006. With regard to the telephone conversation, he explained that he was talking about their time riding four wheelers together when he spoke of "the stuff" that they did. He also explained that his request that the victim think of "us," meaning himself and the victim, when she "screwed other boys" was based on a promise the victim made to him that she would not have sexual intercourse until she was married. He stated that he gave her a class ring, but he did not tell

her to wear it like they were married.

The reason he gave for not appearing at his trial was that his lawyer was not prepared for trial, and Appellant was scared. He said after being gone for about 18 months, he decided to return. According to Appellant, he called the sheriff's office and told him that he would turn himself into authorities the next morning. He went to a motel with Ms. Evans, whom he had just married. That night, Appellant was apprehended at the motel. Ms. Evans was later convicted of two felonies for harboring a fugitive and lying to police.

At the conclusion of the jury trial held May 2010, the jury convicted Appellant of attempted aggravated sexual battery and rape. At a separate sentencing hearing, the trial court sentenced Appellant to five years for attempted aggravated sexual battery and ten years for rape, to be served as a violent offender at 100%. These sentences were run consecutively for an effective sentence of fifteen years.

## ANALYSIS
### Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to convict him of attempted aggravated sexual battery and rape. The State argues that the evidence was sufficient.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the

-6-

weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

At the time of the offense, aggravated sexual battery was defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the victim is younger than thirteen years old. T.C.A. § 39-13-504 (2000). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Criminal attempt is defined as:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be; (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). At the time of the offense rape was defined as, "the unlawful sexual penetration of a victim by the defendant or the defendant by the victim accompanied by . . . [f]orce or coercion." T.C.A. § 39-13-503(a)(1) (1997). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any toher person's body[.]" T.C.A. § 39-13-501(7). Coercion includes the use of parental, custodial, or official authority over a child less than 15 years old. T.C.A. § 39-13-501(1).

Appellant argues that there was no evidence to corroborate the victim's claim that he rubbed his penis on her vagina at the cabin in the summer after her sixth grade year. Although Appellant has not alleged that the victim was an accomplice to his crime, it is current law that convictions may not be based solely upon the uncorroborated testimony of accomplices. *See State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such

testimony. *See State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

In the case at hand, the victim testified as to the sexual activities at the cabin between her and Appellant. The victim's mother testified that she, Appellant, and the victim all stayed at the cabin during the time related by the victim. Appellant also admitted that he stayed at the cabin during that time. Even if the victim could be considered an accomplice, the testimony of her mother and Appellant's own testimony would be sufficient to corroborate the victim's testimony. Appellant argues that there was no corroborating evidence to prove that he was alone with the victim at the cabin. However, as stated above, corroborating evidence need not standing alone support the conviction on its own, but instead merely connect the defendant with the crime. *State v. Griffis*, 964 S.W.2d at 588-89. Therefore, we conclude that the victim's testimony was adequately corroborated.

Appellant also asserts that the evidence was insufficient to support his conviction of rape because there was no proof of coercion. Appellant specifically relies upon the absence of proof of force or coercion that is required for rape but not incest. Tennessee Code Annotated section 39-13-501 contains the definition of coercion as it applies to the offense of rape under Tennessee Code Annotated section 39-13-503(a). This section defines coercion as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of *parental, custodial, or official authority over a child less than fifteen (15) years of age . . . .*" T.C.A. § 39-13-501(1) (emphasis added). Appellant, the victim's mother, and the victim all testified that because Appellant was often unemployed, he was the main caretaker for the victim while her mother was working or going to school. A reasonable person could conclude from the testimony presented at trial that the offenses occurred when the victim's mother was away and Appellant was caring for the victim. The victim testified that Appellant had sexual intercourse with her for the first time on the bed in her mother's room. This occurred the summer before her freshman year in high school. The victim's mother testified that the victim was twelve or thirteen years old. At the time, Appellant and the victim's mother were married, and he was her step-father. Therefore, the use of parental authority over a child less than fifteen is sufficient to establish coercion. The fact that there was no proof of physical abuse or physical force by the defendant to procure sexual intercourse with the victim is irrelevant.

Appellant asserts that the victim was upset with him because of the divorce and the way he treated the victim's mother. He states in his brief, "[t]he testimony at trial clearly showed a troubled young girl concerned about the divorce of her parents and just entering a time in her life where extra freedom meant a great deal to her." Appellant implies that the victim concocted the story as a way to get back at Appellant and to get him out of the house so that she would have more freedom. This argument is essentially an attack on the victim's credibility. As stated above, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such

evidence, are resolved by the trier of fact and not the appellate courts. *Pruett*, 788 S.W.2d at 561. The jury was presented with the victim's testimony and Appellant's testimony at trial. The convictions are proof that the jury found the victim to be credible. We cannot substitute our judgment on credibility of witnesses for that of the jury.

Therefore, we conclude that Appellant's assertions that the evidence was insufficient to support his convictions are without merit.

### Sentencing

Appellant argues that the trial court erred in sentencing him to fifteen years because the trial court failed to apply any mitigating factors and erred in denying his request for alternative sentencing.

In response to the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Tennessee Legislature amended Tennessee Code Annotated section 40-35-210 so that Class A felonies would now have a presumptive sentence beginning at the minimum of the sentencing range. *Compare* T.C.A. § 40-35-210(c) (2003) *with* T.C.A. § 40-35-210(c) (2006).[1] In addition, the amended statute stated that the trial court was not bound by the sentencing guidelines concerning the minimum sentence within a range and the application of enhancement and mitigating factors to increase the sentence above the minimum and that the guidelines were advisory. *Id.* This amendment became effective on June 7, 2005. The legislature also provided that this amendment would apply to defendants who committed a criminal offense on or after June 7, 2005. Acts 2005, ch. 353, § 18. In addition, if a defendant committed a criminal offense on or after July 1, 1982 and was sentenced after June 7, 2005, such defendant could elect to be sentenced under these provisions by executing a waiver of their ex post facto protections. *Id.*

In the case at hand, Appellant committed the crimes after July 1, 1982, and before June 7, 2005. However, he was sentenced after June 7, 2005. We have been unable to locate a waiver of his ex post facto protections in the record. Upon review of the transcript from the sentencing hearing, it is unclear if the trial court sentenced Appellant under the sentencing law that went into effect on June 7, 2005, or the previous sentencing law that

---

[1] This new act as amended by the legislature in 2005 has been cited with approval by the United States Supreme Court. *Cunningham v. California*, 549 U.S. 270, 294, 127 S. Ct. 856, 871 n.18 (2007). In *Cunningham*, the Supreme Court revisited issues addressed in the *Blakely* line of cases. The Supreme Court stated, with approval, that "[o]ther States have chosen to permit judges genuinely 'to exercise broad discretion . . . within a statutory range,' [FN18] which 'everyone agrees,' encounters no Sixth Amendment shoal." *Id.* (quoting *United States v. Booker*, 543 U.S. 220, 233, 125 S. Ct. 738 (2005)).

applied when the crimes were committed. At the beginning of his argument, counsel for the State discussed the effect of *Blakely* on sentencing. The State's argument clearly assumed that the new sentencing law applies. However, there was no other discussion at the sentencing hearing as to which sentencing law applied or whether Appellant needed to execute a waiver of his ex post facto protections. For this reason, we cannot conclude with certainty which sentencing law was followed.

Therefore, we must reverse the sentence and remand for a new sentencing hearing for the application of the prior sentencing law or, in the alternative, for the execution of an ex post facto waiver by Appellant and the application of the new sentencing law.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE